**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Or-Cal Incorporated,<br><br>                Plaintiff,<br><br>v.<br><br>Tessenderlo Kerley Incorporated,<br><br>                Defendant. | No. CV-14-01980-PHX-DGC<br><br>**ORDER** |

The parties have filed cross-motions for summary judgment. Docs. 43, 44. At issue in this matter is the enforceability of a covenant not to compete. The motions are fully briefed. The Court will grant Defendant's motion for summary judgment and deny Plaintiff's motion for summary judgment.[1]

**I.      Background.**

Plaintiff Or-Cal is an Oregon corporation owned by Steve Horn and George Baker. Doc. 45, ¶ 1. Defendant Tessenderlo Kerley, Inc. ("TKI") is a Delaware corporation and a subsidiary of Tessenderlo Group, a corporation headquartered in Phoenix, Arizona. *Id.*, ¶ 2. Or-Cal and TKI "produce, manufacture, and distribute chemical products for use in agriculture, water treatment, animal supplements, and other specialty markets." *Id.*, ¶ 3.

---

[1] Defendant's request for oral argument is denied. The issues are fully briefed, and the Court finds that oral argument will not aid in the resolution of this matter. *See* LR Civ. 7.2(f); Fed. R. Civ. P. 78(b).

On January 29, 2004, the companies entered into a Manufacturing Agreement for tolling[2] lime sulfur,[3] wherein TKI agreed to "manufacture, formulate, label, package, and ship 'Product' to Or-Cal's customers in accordance with Or-Cal's specifications." Doc. 46, ¶¶ 2, 3 (the "Agreement"). "Product" is defined in the Agreement as: "28% Calcium Polysulfide Solution, CAPS or lime sulfur, formulated specifically to meet content requirements of all ORCAL agricultural labels . . . ." *Id.*, ¶ 13. Or-Cal's three agricultural labels[4] are listed in the Agreement as: (1) EPA registration number 71096-11, (2) EPA registration number 71096-0, and (3) Washington State SLN number WA-03008. *Id.*

The Agreement was negotiated over several weeks. *Id.*, ¶ 4. Both parties were represented by counsel. Doc. 45, ¶ 27. The final version contained a covenant not to compete which prohibited TKI from "directly compet[ing] with ORCAL in sales of registered Product in agricultural markets in the United States for a period of two (2) years following the effective date of termination of [the] Agreement." *Id.*, ¶ 9. The parties also stipulated that Arizona law would govern any disputes. Doc. 46, ¶ 20. The parties also entered into a Confidentiality Agreement to protect proprietary information that might be exchanged during the course of the business relationship. Doc. 49-1, Ex. 3.

Over the next several years, Or-Cal purchased large quantities of specially-formulated lime sulfur from TKI. Or-Cal would place an order, and TKI would ship Product to Or-Cal's customers in Oregon, Washington, California, and Texas. Doc. 46, ¶¶ 5, 7. TKI was not responsible for marketing or selling Or-Cal's Product. *Id.*, ¶ 8.

---

[2] "Tolling is an arrangement in which a company (which has specialized equipment) processes raw material or semi-finished goods for another company." Doc. 44 at 5, n.2. TKI processed lime sulfur in accordance with Or-Cal's specific formulae.

[3] Lime sulfur is used as a pesticide for crops and for apple blossom thinning, a process used to improve the quality of apples. Doc. 45, ¶ 5.

[4] "Labels" refer to pesticide product labels, which "provide critical information about how to safely handle and use pesticide products" and require registration with the EPA and certain states. *See* Pesticide Product Labels, United States Environmental Protection Agency, http://www.epa.gov/pesticides/regulating/labels/product-labels.htm.

In 2007, TKI acquired Best Sulfur Products and began manufacturing, marketing, and selling lime sulfur products. *Id.*, ¶¶ 21, 22. TKI also obtained four registered labels for sale of agricultural lime sulfur products. *Id.*, ¶ 23.

On December 17, 2013, TKI notified Or-Cal of its intent to terminate the Agreement effective December 31, 2014. Doc. 45-1, ¶ 11. In late June 2014, TKI informed Or-Cal that it did not intend to honor the covenant not to compete. Doc. 43 at 5. As a result, Or-Cal filed this action for declaratory and injunctive relief. Doc. 1.

## II. Legal Standard.

### A. Summary Judgment.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When presented with cross-motions for summary judgment, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

### B. Covenant Not to Compete.

"Arizona law does not look kindly upon restrictive covenants." *Unisource Worldwide, Inc. v. Swope*, 964 F. Supp. 2d 1050, 1063 (D. Ariz. 2013) (citing *Valley*

- 3 -

*Med. Specialists v. Farber*, 982 P.2d 1277, 1281 (Ariz. 1999)). Covenants not to compete will be enforced if they are (1) "ancillary to contracts for employment or sale of a business" and (2) "reasonably limited as to time and territory." *Gann v. Morris*, 596 P.2d 43, 44 (Ariz. Ct. App. 1979). The enforceability of a covenant not to compete is a question of law. *Farber*, 982 P.2d at 1281. The covenant must protect a legitimate business interest and may not be used merely to stave off competition. *Id.* In addition, the scope of the covenant must not be greater than necessary to protect the legitimate business interests of the party seeking enforcement. *Id.* at 1284. Legitimate business interests include protecting confidential information, trade secrets, and business goodwill. *See, e.g.*, *Bed Mart, Inc. v. Kelley*, 45 P.3d 1219, 1221 (Ariz. Ct. App. 2002); *Farber*, 982 P.2d at 1281.

The question of whether a covenant is reasonable "is a fact intensive inquiry that depends on the totality of the circumstances." *Farber*, 982 P.2d at 1283 (citing *Bryceland v. Northey*, 772 P.2d 36, 40 (Ariz. Ct. App. 1989)). Courts generally look to the (1) subject matter of the contract, (2) the kind and character of the business, (3) the purpose of the restriction, and (4) the intent of the parties. *Gann*, 596 P.2d at 44. Courts generally afford greater deference to restrictive covenants entered into between businesses because "the seller of a business is more likely to have equal bargaining power in negotiating such covenants . . . ." *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 600-01 (9th Cir. 1991). The burden of demonstrating the reasonableness of a covenant falls on the party seeking to enforce it. *Farber*, 982 P.2d at 1286. Arizona courts will not "blue pencil" or "rewrite the covenant or its provisions in order to render it enforceable." *Unisource*, 964 F. Supp. 2d at 1064.

**III. Analysis.**

**A. Appropriate Context.**

The parties dispute the appropriate context in which the Court should analyze the covenant not to compete. Because it is included in an ordinary commercial contract, it does not fall neatly within either of the settings in which covenants not to compete often

- 4 -

are challenged – employer/employee contracts or sale of business contracts.  TKI argues that the employer/employee context is analogous because there is no transfer of business goodwill from Or-Cal to TKI that ordinarily occurs in the sale of a business.  Doc. 43 at 7 n.3.  The Court disagrees.

In the employer/employee context there is often a disparity in bargaining power between the parties.  In addition, enforcing a covenant in this setting "may seriously impair [the employee's] ability to earn a living."  *Gann*, 596 P.2d at 44.  In the sale of a business, the parties usually are of equal bargaining power and represented by counsel.  *See Rent-A-Center*, 944 F.2d at 601 (noting that "the seller of a business is more likely to have equal bargaining power when negotiating such covenant").  Such negotiations reduce the risk of either party falling victim to overreaching.  Thus, courts generally give greater deference to covenants entered into by commercial parties.

The context in this case is that of customer (Or-Cal) and supplier (TKI).  Both parties are experienced in the industry and both retained counsel to draft the Agreement.  As in the sale of a business, any disparity in bargaining power was minimized by the negotiation process.  In addition, some concerns present in the employer/employee context, such as restricting one's livelihood, are absent.  The parties negotiated the covenant not to compete for several weeks, modifying the duration from one year to three years and ultimately agreeing on two years.  Doc. 45, ¶ 12.  Given these facts, the Court will approach the covenant in this case more from the perspective of an arm's length business deal than an employer/employee agreement.

**B.     The Covenant Not to Compete.**

The duration of the covenant is two years.  The parties disagree, however, on the specific types of lime sulfur it covers.  Or-Cal asserts that the covenant precludes TKI from selling any kind of agricultural lime sulfur.  TKI argues that the covenant applies only to Or-Cal's three agricultural lime sulfur labels.

Arizona courts look to the language of the covenant to ascertain the intent of the parties.  *See Goodman v. Newzona Inv. Co.*, 421 P.2d 318, 320 (Ariz. 1966).  The court

may consider parol evidence, however, even if the contract is not ambiguous on its face. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1140 (Ariz. 1993). In determining whether parol evidence is admissible, the court employs a two-step method. *Long v. City of Glendale*, 93 P.3d 519, 528 (Ariz. Ct. App. 2004) (citing *Taylor*, 854 P.2d at 1140). First, before admitting the evidence, the court must "consider the allegations made by the proponent of the extrinsic evidence as to the appropriate interpretation of the writing in light of the extrinsic evidence alleged." *Id.* Next, the court looks to the language of the writing to determine if it is "reasonably susceptible" to the proponent's suggested interpretation. *Id.* If so, the extrinsic evidence is admissible. *Id.* If not, the evidence must be precluded. *Id.*

The parties' disagreement turns on the meaning of "Product" as used in the Agreement. As noted above, "Product" is defined as: "28% Calcium Polysulfide Solution, CAPS or lime sulfur, *formulated specifically* to meet content requirements of all ORCAL agricultural labels . . . ." Doc. 46, ¶ 13 (emphasis added). The labels referred to are: (1) EPA registration number 71096-11, (2) EPA registration number 71096-0, and (3) Washington State SLN number WA-03008. *Id.*

Or-Cal seeks to introduce extrinsic evidence to show that the parties intended "Product" to include all percentages of lime sulfur, not just Or-Cal's three formulations. It asks the Court to consider several facts: (1) the EPA allows a 3% variance in shipping lime sulfur (Doc. 51-1, ¶ 17); (2) TKI's EPA labels are for 29% and 27.5% lime sulfur (Doc. 50 at 10); (3) Or-Cal's labels are for 27% and 28% lime sulfur (Doc. 45, ¶ 10); (4) TKI only has one storage tank for lime sulfur, which means all the lime sulfur it produces is essentially the same (Doc. 51-1, ¶¶ 13-15); and (5) TKI's own test results show it has been producing 29% and 30% lime sulfur under Or-Cal's labels and selling it as "Product" (Doc. 51-1, ¶ 18).

The parties clearly defined "Product" in the Agreement. It includes "28%" lime sulfur solution "formulated specifically" in accordance with three clearly identified Or-Cal labels. There are no references to EPA standards and no indication that the parties

sought to leave room for percentage variations. Quite the opposite. The parties took pains to limit "Product" to "28%" and three specifically-identified formulations of lime sulfur, all in a definition that was negotiated with counsel over the period of several weeks.[5] EPA standards could have been included in the definition if that was the intent of the parties, but they were not.

The Court concludes that "Product" is so clearly and narrowly defined that it is not reasonably susceptible to the much broader interpretation proffered by Or-Cal. The Court therefore will not consider Or-Cal's extrinsic evidence. As the Arizona Court of Appeals has observed, "one cannot claim that one is interpreting a written clause with extrinsic evidence if the resulting interpretation unavoidably changes the meaning of the writing[.]" *Long*, 93 P.3d at 529 (internal quotation marks omitted). The Court accordingly construes the covenant not to compete as forbidding TKI from selling only lime sulfur formulated specifically in accordance with the three Or-Cal agricultural labels identified in the Agreement. Doc. 1-1, § 1.1.

### C. Legitimate Business Interest.

To determine the enforceability of the covenant as so construed, the Court must consider whether the covenant is necessary to protect Or-Cal's legitimate business interests. *Farber*, 982 P.2d at 1281. Under Arizona law, covenants not to compete are invalid unless they protect a legitimate business interest. *Phoenix Orthopedic Surgeons, Ltd. v. Peairs*, 790 P.2d 752, 755 (Ariz. Ct. App. 1989) (overruled on other grounds). Or-Cal argues that the covenant protects its product formulations, internal cost of its product, customer information, and delivery schedule. It also claims that TKI cultivated customer relationships during the time TKI shipped products to Or-Cal's customers.

---

[5] "Product" was initially defined as "lime sulfur for the specific use of apple orchard blossom thinning." Doc. 46-3, Ex. A. The first draft also noted: "TKI will always have the ability to manufacture and sell . . . lime sulfur . . . as long as it is not used for apple orchard bloom thinning . . . ." *Id.* As a result of negotiations, the parties' final definition of Product became narrower and more precise.

- 7 -

To protect confidential information disclosed during the course of the Agreement, the parties executed a Confidentiality Agreement. TKI agreed not to make any commercial use of proprietary information "furnished orally or in writing," and that any such information "be kept confidential[.]" Doc. 49-1, Ex. 3. The Confidentiality Agreement further required the parties to return proprietary documents "without retaining any copies, extracts or other reproductions of all or part thereof." *Id.* The parties agreed that the obligations remained effective for ten years after receipt of any confidential material. Doc. 49-1, Ex. 3. Or-Cal does not allege that TKI has breached the Confidentiality Agreement.

In *Unisource*, the court found that a covenant not to compete did not protect any legitimate business interest of the employer because the employee signed a separate confidentiality agreement. 964 F. Supp. 2d at 1065. The agreement protected the same business interests that the employer claimed necessitated the covenant, thereby reducing the covenant to the status of an "umbrella covenant" that operated only to "undermine fair competition and hurt [the defendant's] ability to work." *Id.* The court accordingly found it unenforceable. *Id.*

Although *Unisource* was decided in the employer/employee context, its reasoning is instructive. As in *Unisource*, the Confidentiality Agreement in this case protects all of Or-Cal's confidential information disclosed to TKI, including Or-Cal's labels, pricing information, customer lists, and delivery schedule. In fact, Or-Cal repeatedly stresses that the Confidentiality Agreement protects that same information and maintains that TKI is under a continuing obligation not to disclose or make commercial use of confidential information. Therefore, Or-Cal's legitimate business interests are already adequately protected, and the covenant not to compete serves no purpose other than to prevent competition in the U.S. agricultural lime sulfur market.

Or-Cal argues that the covenant serves the same business purposes as the covenant in *Oberto Sausage Co. v. JBS S.A.*, No. C10-2033 RSL, 2011 WL 939615 (W.D. Wash. March 11, 2011). In *Oberto*, the plaintiff, a manufacturer of beef jerky, entered into an

1 exclusive manufacturing agreement with a beef supplier in Brazil. *Id.* at *1. The contract
2 contained a covenant not to compete, which prohibited the defendant from "compet[ing]
3 in any way with [the plaintiff]" for five years anywhere in the world. *Id.* at *4. It also
4 contained a confidentiality agreement. *Id.* The plaintiff claimed that the defendant had
5 obtained the plaintiff's proprietary recipes, formulas, specialty equipment, research
6 initiatives, and manufacturing processes. *Id.* at *1. When the defendant terminated the
7 agreement and began working with another jerky manufacturer, the plaintiffs sought a
8 preliminary injunction. *Id.* at *2. The court found that the covenant was likely
9 enforceable, especially considering that the defendant still had access to the plaintiff's
10 equipment and development initiatives at its plant in Brazil. *Id.* at *4, 6. The court
11 questioned, however, "whether the non-compete is reasonable as written with respect to
12 time, geography, and scope." *Id.* at *4 n.5.

*Oberto* is distinguishable. TKI does not have access to any of Or-Cal's specialized equipment, production costs, or research and development information. Doc. 49, ¶ 5; Doc. 54, ¶ 5. This undercuts Or-Cal's claim that the covenant is necessary to protect its legitimate business interests. It is also consistent with the Court's finding that the Confidentiality Agreement adequately protects those interests. Moreover, the Court in *Oberto* did not actually determine that the covenant was enforceable. It merely concluded that the plaintiff satisfied one of the elements necessary to obtain a preliminary injunction.

**D.    Reasonableness.**

The Court must also consider whether the covenant not to compete is reasonable. *Farber*, 982 P.2d at 1281. Or-Cal sells its products in Oregon, Washington, California, and Texas. Doc. 46, ¶¶ 5, 7. The language of the covenant, however, prohibits TKI from selling "Product" anywhere in the United States. Or-Cal asserts that this nationwide scope is reasonable because "the applicable crops grow in multiple regions, not just Oregon and Washington" (Doc. 50 at 7), but this argument misses the point. The relevant inquiry is not the location of potential markets, but the actual markets in which Or-Cal

competes.  The covenant must protect Or-Cal's interests in those markets.  Prohibiting TKI from selling Product in Nebraska or any other state where Or-Cal does not compete cannot be said to protect Or-Cal's legitimate business interests.[6]  Or-Cal has failed to provide any reasonable justification for the nationwide geographic scope of the covenant. *See Farber*, 982 P.2d at 1286 (burden of showing reasonableness falls on the party seeking enforcement).[7]

The covenant's two-year term is also unreasonable.  Or-Cal argues that two years are required to obtain an EPA label and secure other manufacturing agreements.[8]  Even if this is accepted as true, the Agreement effectively gives Or-Cal three years to accomplish these objectives.  It requires that the party seeking to terminate the Agreement give 12 months' prior written notice, and then includes an additional non-compete period of two years after the contract terminates.  Doc. 46-3, Ex. G.  In this case, TKI gave notice on December 17, 2013 of its intent to terminate the Agreement on December 31, 2014.  Doc. 45-2, Ex. 2.  If the two-year covenant were then enforced, Or-Cal would have a total of three years (from December 2013 to December 2016) to obtain EPA labels and secure other manufacturing agreements – more time than even Or-Cal claims it needs.  The time period of the covenant is therefore unreasonable.

Or-Cal claims that *Baker's Aid v. Hussman Foodservice Co.*, 730 F. Supp. 1209 (E.D.N.Y. 1990), compels a different result.  The Court disagrees.  In *Baker's Aid*, the plaintiff, a distributor of ovens manufactured by third parties, entered into a

---

[6] Or-Cal may respond that the covenant as construed by the Court applies only to "Product," and Or-Cal has a proprietary interest in preventing TKI from selling its proprietary formula anywhere.  But Or-Cal has not sued for misappropriation of trade secrets or comparable wrongs, and vigorously asserts that the Confidentiality Agreement protects these interests.  Even if this argument could be viewed by some as justifying a nationwide covenant not to compete, the covenant is also unreasonable as to time as discussed next.

[7] Or-Cal also argues that the covenant is reasonable because it will not require TKI to relocate.  The question, however, is whether the covenant protects a legitimate interest of Or-Cal, not whether it imposes an undue burden on TKI.

[8] Or-Cal does not explain why it needs new EPA labels when it already has at least two that cover its lime sulfur product, as the Agreement notes.

- 10 -

1  manufacturing agreement with the defendants to reverse engineer ovens. *Id*. at 1211.
2  Once the reverse engineering process was complete, the specifications would become the
3  property of the plaintiff. *Id.* The agreement contained a covenant not to compete
4  prohibiting the defendants from producing and selling ovens based on those
5  specifications for ten years. *Id.* at 1213.

6  In its analysis, the court – which was not applying Arizona law – noted that the
7  case involved "neither a transfer of goodwill nor the loss of an employee's livelihood."
8  *Id.* at 1214. It applied a reasonableness test and found the covenant enforceable because
9  it protected the plaintiff's specifications from being utilized unfairly. *Id.* at 1215. The
10 court noted that the defendants did not have an independent source of oven specifications
11 prior to the agreement, and therefore the covenant was enforceable only "to the extent
12 that [it] proscribe[d] competition based on the [oven specifications]." *Id.*

13 Unlike *Baker's Aid*, TKI acquired an independent source of producing lime sulfur
14 when it acquired Best Sulfur Products in 2007. TKI also obtained four of its own
15 agricultural lime sulfur labels. TKI is not attempting to misappropriate the very object of
16 the Agreement for its own commercial use.

17       **E.**    **The Covenant is Unenforceable.**

18 The covenant fails to advance a legitimate business purpose and is unreasonable in
19 duration and geographic scope. Even applying the deference found in sale of business
20 cases, the Court concludes that the covenant is unenforceable. Or-Cal hopes to insulate
21 itself from competition in the agricultural lime sulfur market – nationwide – for two
22 years. That is not a proper purpose of a covenant not to compete under Arizona law.
23 *Farber*, 982 P.2d at 1281.

24 Under Arizona law, the Court cannot "blue pencil" the covenant to render it
25 enforceable. Thus, the Court will enter summary judgment in favor of TKI.

26 **IT IS ORDERED:**

27     1.    Plaintiff's motion for summary judgment (Doc. 44) is **denied**.

28     2.    Defendant's motion for summary judgment (Doc. 43) is **granted**.

1   3.   Defendant's motion to strike (Doc. 55) is **denied**.

2   4.   The Clerk is directed to enter judgment and termination this action.

Dated this 23rd day of February, 2015.

_____
David G. Campbell
United States District Judge

- 12 -